No. 17-421 T
(Chief Judge Susan G. Braden)

_____

_____

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

_____

ALICE KIMBLE,

Plaintiff

v.

THE UNITED STATES,

Defendant

_____

**MOTION AND BRIEF OF THE UNITED STATES FOR SUMMARY JUDGMENT**

_____

RICHARD E. ZUCKERMAN
Principal Deputy Assistant Attorney General
Tax Division
U.S. Department of Justice

DAVID I. PINCUS
JASON S. SELMONT
ELIZABETH A. KANYER

Attorneys, Tax Division
U.S. Department of Justice
Court of Federal Claims Section
Post Office Box 14198
Ben Franklin Station
Washington, D.C. 20044
Tel: (202) 616-3338
Fax: (202) 514-9440
jason.s.selmont@usdoj.gov

_____

_____

## TABLE OF CONTENTS

MOTION OF THE UNITED STATES FOR SUMMARY JUDGMENT ................................. vii

BRIEF IN SUPPORT OF THE MOTION OF THE UNITED STATES FOR SUMMARY
JUDGMENT ................................................................................................................... 1

QUESTIONS PRESENTED ............................................................................................ 4

FACTS ............................................................................................................................ 4

    I.    The UBS Account ............................................................................................ 4

    II.   The HSBC Account ......................................................................................... 7

    III.  Plaintiff's Tax Return Preparation ................................................................. 7

    IV.  Offshore Voluntary Disclosure Program ..................................................... 10

    V.   The IRS Audit and the Current Litigation .................................................... 12

SUMMARY JUDGMENT STANDARD ...................................................................... 13

ARGUMENT ................................................................................................................. 14

    I.    Statutory and Regulatory Framework for the FBAR Penalty .......................... 14

        A.  The requirement to report foreign financial accounts ............................... 14

        B.  Judicial review of the FBAR penalty ...................................................... 15

    II.   Mrs. Kimble Is Liable for a Willful FBAR Penalty for 2007 .......................... 17

        A.  Mrs. Kimble had a foreign bank account in 2007 and was therefore required to file
           an FBAR no later than June 30, 2008 .................................................... 17

        B.  Mrs. Kimble willfully failed to file an FBAR for the 2007 calendar year ............... 17

           1.   Voluntariness: Mrs. Kimble's failure to file her FBAR was voluntary, rather
               than accidental .............................................................................. 18

      a.  By virtue of her having signed her federal income tax return, Mrs. Kimble is charged with knowledge of the FBAR reporting requirement ...............................................................................19

      b.  Mrs. Kimble had knowledge of her obligation to file the FBAR, and failed to do so ......................................................................21

    2.  Willful Blindness: Mrs. Kimble acted with willful blindness to her duty to file a timely FBAR. ...............................................................23

    3.  Reckless Disregard: Mrs. Kimble recklessly disregarded her duty to file a 2007 FBAR. ...............................................................................25

III.  The Amount of the Penalty Imposed Against Plaintiff Was an Appropriate Exercise of the IRS's Discretion ...........................................................28

IV.  This Court Should Not Follow the Decision of the Western District of Texas in *United States v. Colliot* Regarding the Maximum FBAR Penalty. ...........34

    A.  In the 2004 Jobs Act, Congress increased the maximum penalties for willful FBAR violations in order to improve the reporting of foreign financial accounts..............................................................................35

    B.  The 2004 amendment to the statute superseded the outdated regulation....................36

CONCLUSION...................................................................................37

DEFENDANT'S EXHIBITS

    I.  <u>UBS Account Documents</u>

• Exhibit 1 ..................................................................................1
• Exhibit 2 ..................................................................................2
• Exhibit 3..................................................................................3
• Exhibit 4..................................................................................4
• Exhibit 5............................................................................. 5-6
• Exhibit 6............................................................................. 7-8

    II.  <u>UBS Account Statements</u>

• Exhibit 7..............................................................................9-14
• Exhibit 8............................................................................15-43
• Exhibit 9............................................................................44-58

III.   Forms 1040. U.S. Individual Income Tax Returns

- Exhibit 10..................................................................................................59-64
- Exhibit 11..................................................................................................65-72
- Exhibit 12..................................................................................................73-78
- Exhibit 13..................................................................................................79-84
- Exhibit 14..................................................................................................85-91

IV.   Forms 1040X, Amended U.S. Individual Income Tax Returns

- Exhibit 15..................................................................................................95-96
- Exhibit 16.................................................................................................97-100
- Exhibit 17...............................................................................................101-104
- Exhibit 18...............................................................................................105-110
- Exhibit 19...............................................................................................111-117
- Exhibit 20...............................................................................................118-123

V.   Form TD F 90-22.1, Report of Foreign Bank and Financial Accounts (FBAR)

- Exhibit 21...............................................................................................124-125
- Exhibit 22...............................................................................................126-127
- Exhibit 23...............................................................................................128-129
- Exhibit 24...............................................................................................130-131
- Exhibit 25...............................................................................................132-133
- Exhibit 26...............................................................................................134-135

VI.   IRS Documents and Administrative Documents

- Exhibit 27...............................................................................................136-137
- Exhibit 28...............................................................................................138-141
- Exhibit 29...............................................................................................142-149
- Exhibit 30...............................................................................................150-155
- Exhibit 31...............................................................................................156-198
- Exhibit 32..................................................................................................... 199
- Exhibit 33..................................................................................................... 200
- Exhibit 34...............................................................................................201-206

VII.   Deposition Transcripts

- Exhibit 35...............................................................................................206-239
- Exhibit 36...............................................................................................240-262
- Exhibit 37...............................................................................................263-278

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*Aerolineas Argentinas v. United States*,
  77 F.3d 1564 (Fed. Cir. 1996)............................................................................36

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986)............................................................................................13

*Bedrosian v. United States*,
  No. 2:15-cv-05853, 2017 WL 3887520 (E.D. Pa. Sept. 5, 2017),
  *appeal docketed*, No. 17-3525 (3d Cir. Nov. 21, 2017)....................................26

*Burack v. United States*,
  198 Ct. Cl. 855 (1972) .......................................................................................19

*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986)............................................................................................13

*Farrell v. United States*,
  313 F.3d 1214 (9th Cir. 2002) ...........................................................................37

*Jarnagin v. United States*,
  134 Fed. Cl. 368 (2017) .....................................................................................19

*Kobus v. United States*,
  103 Fed. Cl. 575 (2012) ................................................................................23, 25

*Estate of Liftin v. United States*,
  111 Fed. Cl. 13 (2013) .................................................................................. 18-19

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
  475 U.S. 574 (1986)............................................................................................13

*Moore v. United States (Moore I)*,
  2015 WL 1510007 (W.D. Wa. Apr. 1, 2015) ...............................................16, 31

*Moore v. United States (Moore II)*,
  2015 WL 4508688 (W.D. Wa. July 24, 2015)..............................................31, 32

*Peck v. Thomas*,
  697 F.3d 767 (9th Cir. 2012) .............................................................................31

*Safeco Ins. Co. of Am. v. Burr*,
  551 U.S. 47 (2007).......................................................................................18, 25

*Scofield v. Lewis*,
  251 F.2d 128 (5th Cir. 1958) ........................................................37

*Sealey v. United States*,
  71 Fed. Cl. 278 (2006) ..............................................................36

*United States v. Bohanec*,
  No. 2:15-cv-4347, 2016 WL 7167860 (C.D. Cal. 2016) ................26

*United States v. Colliot*,
  No. 16-1281, 2018 WL 2271381 (W.D. Tex. May 16, 2018) ..........35

*United States v. Garrity*,
  No. 15-243, 2018 WL 1611387 (D. Conn. April 3, 2018) ..............25

*United States v. Healy Tibbitts Constr. Co.*,
  713 F.2d 1469 (9th Cir. 1983) ....................................................16

*United States v. McBride*,
  908 F. Supp. 2d 1186 (D. Utah 2012) ....................................... *passim*

*United States v. Williams (Williams I)*,
  No. 09-437, 2010 WL 3473311 (E.D. Va. Sept. 1, 2010) ..............16

*United States v. Williams (Williams II)*,
  489 Fed. App'x 655 (4th Cir. 2012) ...............................19, 21, 26

*United States v. Williams (Williams III)*,
  No. 09-437, 2014 WL 3746497 (E.D. Va. Jun. 26, 2014) ........ *passim*

**Statutes:**

26 U.S.C. (Internal Revenue Code of 1986)

  § 6672............................................................................26

31 U.S.C.

  § 5311............................................................................14

  § 5314........................................................................ i, 1, 14

  § 5321........................................................................ *passim*

American Jobs Creation Act of 2004, Pub. L. No. 108-357 ............... *passim*

v

Money Laundering Control Act of 1986, Pub. L. No. 99-570,
100 Stat. 3207 (1986) ............................................................................................................34

**Other Authorities:**

31 C.F.R.

§ 103.24 (2009) .................................................................................................1, 14, 17

§ 103.27 (2009) ......................................................................................................14, 17

§ 103.47 (1987-1999) ..............................................................................................34, 35

§ 103.56 (2009) ......................................................................................................15, 28

§ 103.57 ...........................................................................................................34, 35, 37

§ 1010.350 ......................................................................................................................1

§ 1010.810 (2014) ..................................................................................................15, 28

§ 1010.820 .....................................................................................................................35

Final Rule, 52 Fed. Reg. 11436, 11440 (Apr. 8, 1987) .........................................................37

H.R. Rep. No. 91-975 (1970), *reprinted in* 1970 U.S.C.C.A.N. 4394 ....................................14

H.R. Rep. No. 108-755 (2004) ........................................................................................ 35-36

Rules of the United States Court of Federal Claims Rule 56 ....................................... vii, 2, 13

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

———————————————

No. 17-421 T
(Chief Judge Susan G. Braden)

ALICE KIMBLE

Plaintiff,

v.

THE UNITED STATES,

Defendant.

———————

## MOTION OF THE UNITED STATES
## FOR SUMMARY JUDGMENT

———————

Pursuant to Rule 56 of the Rules of the United States Court of Federal Claims (RCFC), defendant, the United States, moves for summary judgment in defendant's favor on the grounds that there are no genuine issues as to any material fact and defendant is entitled to judgment as a matter of law. As more specifically set forth below in our accompanying brief, the government is entitled to judgment as a matter of law because plaintiff's failure to file the Report of Foreign Bank and Financial Accounts (the "FBAR") pursuant to 31 U.S.C. § 5314 was a willful violation of her statutory obligation. Furthermore, the government is entitled to judgment as a matter of law because the Internal Revenue Service properly exercised its discretion in calculating the amount of the FBAR penalty pursuant to 31 U.S.C. § 5321(a)(5)(C).

In support of this motion, defendant relies upon the pleadings, the Stipulations of Fact (ECF No. 28), the accompanying brief, the attached exhibits, and the attached Declaration of Melissa L. Irons and accompanying documents.

Respectfully submitted,

_____6/27/2018_____          _/s/ Jason S. Selmont_____
Date                         JASON S. SELMONT
                             Attorney of Record
                             U.S. Department of Justice
                             Tax Division
                             Court of Federal Claims Section
                             Ben Franklin Station, PO Box 26
                             Washington, D.C. 20044
                             Tel:  (202) 616-3338
                             Fax:  (202) 514-9440
                             jason.s.selmont@usdoj.gov

                             RICHARD E. ZUCKERMAN
                             Principal Deputy Assistant Attorney General
                             DAVID I. PINCUS
                             Chief, Court of Federal Claims Section
                             ELIZABETH A. KANYER
                             Trial Attorney


                             _/s/ David I. Pincus_____
                             Of Counsel

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

———————————————

No. 17-421 T
(Chief Judge Susan G. Braden)

ALICE KIMBLE

Plaintiff,

v.

THE UNITED STATES,

Defendant.

—————

**BRIEF IN SUPPORT OF THE MOTION OF
THE UNITED STATES FOR SUMMARY JUDGMENT**

—————

## INTRODUCTION

Each year, U.S. citizens who hold a financial account in a foreign country are required to report the account to the Treasury Department. *See* 31 U.S.C. § 5314; 31 C.F.R. § 103.24 (2009).[1] *Holding* such an account is not illegal, but failing to report it can lead to a civil monetary penalty. The form on which the report is made is the Report of Foreign Bank and Financial Account, often abbreviated FBAR—and the penalty for failing to file it is known as "the FBAR penalty." Where the failure to report the account is willful, the amount of the penalty is calculated as 50% of the balance in the account with a minimum of $100,000. It is that "willful" penalty that is at issue here.

---

[1] In 2010, the regulations were relocated to 31 C.F.R. § 1010.350. The United States refers to this Brief to the regulations effective in 2007.

The crux of the parties' dispute is whether Alice Kimble's failure to file the FBAR for 2007 was "willful" and whether, as a result, the IRS properly assessed Mrs. Kimble with a willful-violation penalty under 31 U.S.C. § 5321(a)(5)(C).  In 2007, Mrs. Kimble had nearly $1.5 million in a Swiss bank account and approximately $144,000 in a French bank account.  The law required Mrs. Kimble to disclose her foreign bank accounts on a report filed with the Treasury Department no later than June 30, 2008.  She did not file the report.

In her Complaint, Mrs. Kimble alleged that her failure to file the report was not willful, but rather stemmed from "ignorance of the requirements of the law."  (Compl. ¶ 12 (Dkt. No. 1).) However, Mrs. Kimble, by her own admission, stated that it was her intent to keep her account at UBS a "total secret" from everyone, including the United States government.  She signed documents with UBS consistent with this intent.  Moreover, she declared under penalty of perjury on her income-tax return that she did ***not*** "have an interest in or a signature or other authority over a financial account in a foreign country" "at any time during 2007."  (Def. Ex. 13 at 82.)

Although willfulness is generally a fact question, there is no need for a trial in this case. As defendant will show, there "is no dispute as to any material fact" and defendant is therefore "entitled to judgment as a matter of law."  RCFC 56(a).  It is beyond dispute that Mrs. Kimble: (1) knew that she had funds in a Swiss bank account and in a French bank account; and (2) did not report her interest in the accounts on a timely FBAR, despite that knowledge, instead representing falsely on her income-tax return that she had no foreign bank accounts.

By themselves, those facts establish that Mrs. Kimble's failure to file the FBAR was willful.  But other undisputed facts further support the same conclusion.  For example, Mrs. Kimble admitted to managing her foreign accounts with the help of her UBS bankers and her ex-

husband, Michael.  Indeed, Mrs. Kimble routinely met with Swiss bankers to discuss the performance of the investments in her account.  Moreover, Mrs. Kimble's undisputed actions demonstrate her clear intent to conceal the account from U.S. authorities.  Mrs. Kimble did not maintain the account in her own name; rather, the account was referred to only by number, providing anonymity for her financial transactions.  Mrs. Kimble further hid the account from the United States by not investing in U.S. securities, ensuring that her investment transactions would not be reported to the IRS.  Mrs. Kimble failed to tell her accountant that she had a foreign bank account, or that she had earned foreign income on transactions in the account, thereby reducing the income reported on her tax returns.

A taxpayer failing to file a timely FBAR acts willfully, and is subject to a penalty under 31 U.S.C. § 5321(a)(5)(C), if he or she (1) failed to file the report voluntarily, and not accidentally; (2) was willfully blind to the legal obligation and to the facts giving rise to the obligation; or (3) recklessly disregarded the legal duty to file the report.  Here, the undisputed facts clearly establish that Mrs. Kimble was willful under all three standards.

Furthermore, Mrs. Kimble contends that the amount of the penalty was arbitrary and capricious and an abuse of discretion on the part of the IRS.  The facts show the exact opposite. The IRS examined Mrs. Kimble's FBAR non-compliance and followed the penalty guidelines provided in the Internal Revenue Manual, which comply with the statute, in determining the penalty amount.  For those reasons, the Court should grant summary judgment to defendant on the claims in Mrs. Kimble's Complaint.

After an overview of the uncontroverted facts, we explain in detail the statutory and regulatory scheme for the penalties before discussing the substance of the case.  When the

correct standards are applied, it is clear that there are no genuine disputes of material fact, and that the United States is entitled to judgment as a matter of law.

## QUESTIONS PRESENTED

1. Is plaintiff liable for a penalty for her willful failure to file the FBAR for reporting year 2007?

2. If plaintiff is liable for the willful FBAR penalty, did the Internal Revenue Service properly apply its discretion in imposing FBAR penalties in the aggregate amount of $697,229?

## FACTS

Plaintiff, Alice Kimble, is a United States citizen.  (Stip. ¶ 1.)  During calendar year 2007, Mrs. Kimble was the owner of two foreign financial accounts—one at the Union Bank of Switzerland ("UBS"), a Swiss bank, and a second at HSBC in Paris, France ("HSBC").  (Stip. ¶¶ 11, 32.)  During the calendar year 2007, the UBS Account had a high balance of $1,499,577.61 (Irons Decl.[2] at 0109, 0364), and the HSBC Account had a high balance of $143,974.13.  (Stip. ¶ 39.)  Although Mrs. Kimble had an obligation to file an FBAR to disclose these accounts to the U.S. government, she failed to do so.

I. <u>The UBS Account</u>

The UBS Account was opened by plaintiff's parents, Harold Green and Frances Green (the "Greens"), in the 1970s.  (Stip. ¶ 12.)  The Greens were both born in the United States (Stip.

---

[2] References to "Irons Decl." are to the Declaration of Melissa L. Irons.  For the Court's convenience, each citation has been truncated from the full Bates' label (Kimble_AdminRec) to the page numbers only.

4

¶ 10), and for many years, Mr. Green was a practicing attorney in New York. (Alice Tr.[3] 92:17-93:4.) Mr. Green opened the account at UBS using some of his earnings from his law practice. (Alice Tr. 23:14-20.) After the account was opened but before 1980, the Greens made their only daughter, Alice, a co-owner of the account. (Stip. ¶ 13.) At the time she was added to the account, Mrs. Kimble was instructed by her father to "never tell anybody about this account," as it was allegedly meant as a source of funds in case Mrs. Kimble or the Greens had to escape persecution at the hands of the United States government. (Alice Tr. 18:21-19:12.) When Mrs. Kimble was added to the UBS Account, neither Mr. Green nor Mrs. Green filed a gift tax return to report the transaction to the IRS. (*See* Alice Tr. 17:23-18:7.)

Although she was a co-owner of the account, plaintiff did not play an active role in the management of the UBS Account during her father's lifetime. Rather, her father handled the investment decisions, and, from time to time, sought advice from plaintiff's then-husband, Michael Kimble, a high-yield bond portfolio analyst.[4] (Stip. ¶ 16, 29.)

Upon Mr. Green's death in 1997, Mrs. Kimble began actively managing the UBS Account. (Alice Tr. 26:24-27:2, 27:18-20.) Between 1998 and 2008, plaintiff met with representatives of UBS in New York at least six times and at least one time in Switzerland to discuss the investments in her account. (Stip. ¶ 28.) At these meetings, plaintiff was presented with an overview of the investments in her account and recommendations on where to invest the account funds. (Alice Tr. 27:21-28:14.) Each year, the balance in the account grew. (Def. Exs.

---

[3] References to "Alice Tr." are to the transcript of the deposition of Alice Kimble at Exhibit 35.

[4] Mr. Kimble learned of the UBS Account several years after his marriage to plaintiff when Mr. Green informed him of the existence and alleged purpose of the account. (Alice Tr. 21:25-22:4.) However, Mr. Kimble was not aware that Mrs. Kimble was a co-owner of the account until shortly before their divorce. (Michael Tr. 63:22-64:1.)

8-9.)  Mrs. Kimble discussed investment decisions with her ex-husband, who also accompanied her to several meetings with UBS representatives.  (Stip. ¶ 29; Alice Tr. 31:12-17.)  Mr. Kimble continued to provide investment advice on the UBS Account to Mrs. Kimble subsequent to their divorce in 2000.[5]  (Alice Tr. 31:4-11)  On at least one occasion, based on Mr. Kimble's advice, Mrs. Kimble directed UBS to convert her investment positions in British pounds to Swiss francs when the British pound was overvalued.  (Alice Tr. 47:1-10; Michael Tr.[6] 45:8-19.)

Coinciding with one of her meetings with UBS representatives, on July 22, 1998, Mrs. Kimble signed two UBS documents—the Basic Trust Agreement and the Numbered Account Agreement.  (Stip. ¶¶ 22-23.)  By signing the Numbered Account Agreement, Mrs. Kimble was able to maintain the UBS account as a so-called "numbered account" so that her name was not associated with the account; rather, the bank used the account number as the means of identifying the client.  Additionally, the Numbered Account Agreement directed UBS to hold all correspondence regarding the UBS Account at the bank, for which service plaintiff paid additional fees to the bank.  (Stip. ¶ 23; Def. Ex. 1.)

Later on, in 2005, Mrs. Kimble executed several new UBS documents: Basic Document for Account/Custody Account Relationship, Supplement for New Account US Status Tax Form US Withholding Tax/Natural Person Assets and Income Subject to United States Withholding Tax Declaration of Non-US Status, and Verification of the beneficial owner's identity.  (Stip.

---

[5] During their divorce proceedings, neither Mrs. Kimble nor Mr. Kimble listed the UBS Account on any divorce document; the UBS Account was not taken into consideration with respect to the equitable division of property.  (Alice Tr. 98:10-16.)

[6] References to "Michael Tr." are to the transcript of the deposition of Michael Kimble at Exhibit 36.

¶¶ 24-26; Def. Ex. 3-5.)  In these documents, Mrs. Kimble verified herself as the sole account owner and instructed UBS to retain all correspondence at the bank for a fee.

Around this time, Mrs. Kimble disclosed the UBS Account to her son, David.  (Alice Tr. 22:19-23:1.)  Mrs. Kimble instructed David to keep this account "totally secret."  (Alice Tr. 116:17-19.)  Shortly thereafter, Mrs. Kimble signed a UBS document titled, "General power of attorney," on April 15, 2005, naming both Mrs. Green and David, as her agents with respect to the UBS Account.  (Stip. ¶ 27; Def. Ex. 6.)

## II.  The HSBC Account

In about 1998, plaintiff and her then-husband, Michael Kimble, opened a bank account at HSBC (the "HSBC Account").  (Stip. ¶ 32.)  They used the HSBC Account to pay expenses related to their recently purchased apartment in Paris.  (Stip. ¶ 35.)  From 1998 to about 2009, when she closed the account after having sold her Paris apartment, Mrs. Kimble made numerous transactions on the HSBC account, including making deposits and withdrawals, writing checks, and engaging in investment activities.  (Alice Tr. 29:12-26.)  In about 2008, Mrs. Kimble authorized the bank to provide David access to the HSBC Account while he was living in Paris. (Stip. ¶ 37.)

## III.  Plaintiff's Tax Return Preparation

Beginning in about 2000, plaintiff engaged Steven Weinstein, a certified public accountant licensed in New York, to prepare her federal and New York state individual income tax returns.  (Stip ¶ 41.)  Each year, Mrs. Kimble provided Mr. Weinstein with income statements from her alimony income and U.S. investment income.  (Alice Tr. 71:6-9.)  However, she never provided him with income information from the UBS Account or the HSBC account.

(Alice Tr. 71:11-72:3.)  Indeed, *plaintiff never disclosed the existence of either account* to Mr.

Weinstein before approximately 2010.  (Stip ¶ 43.)

After Mr. Weinstein prepared her returns, Mrs. Kimble signed and filed her returns

without reviewing them for accuracy.  (Stip. ¶ 46.)  Mrs. Kimble did not ask Mr. Weinstein any

substantive questions about the tax positions taken on her return.  By her own admission,

plaintiff never sought advice from Mr. Weinstein on the proper reporting of foreign investment

income on her U.S. individual income tax returns.  (Stip. ¶ 44.)  Nor did plaintiff ever seek

advice from Mr. Weinstein on whether she was required to file the FBAR or on how to complete

the FBAR.  (Stip. ¶ 45; Alice Tr. 116:17-19.)

Included with each tax return that Mrs. Kimble signed under penalty of perjury was a

Schedule B, Interest and Ordinary Dividends, which discloses interest and dividend income.

(*E.g.*, Def. Ex. 13 at 82.)  Before 2008, Mrs. Kimble's originally filed tax returns failed to

disclose interest or dividend income earned from the UBS Account and the HSBC Account for

each year in which she earned income.  (*E.g.*, Def. Exs. 10-14.)

Additionally, Schedule B to the individual income tax return (Form 1040) included a

"yes" or "no" question in line 7a in Part III of Schedule B for 2007.  That question asked, "At

any time during [the appropriate year], did you have an interest in or signature or other authority

over a financial account in a foreign country, such as a bank account, securities account, or other

financial account?"  (Def. Ex. 13 at 82; *accord* Def. Exs. 10-12, 14.)  The question on the

Schedule B also referred the taxpayer to the instructions to determine whether he or she fit within

any exceptions.

8

The Schedule B instructions informed taxpayers as to when he or she should check the

"Yes" box for line 7a and the consequences of checking the "Yes" box.  The instructions

provided that a taxpayer should check the "Yes" box for line 7a if either:

1. You owe more than 50% of the stock in any corporation that owns one or more foreign bank accounts.

2. At any time during 2007 you had an interest in or signature authority over a financial account in a foreign country (such as a bank account, securities account, or other financial accounts).

(Def. Ex. 27 at 137.)   The instructions directed taxpayers to Form TD F 90-22.1 to determine if

he or she had an interest in or signature authority over a financial account in a foreign country.

(*Id.*)  Specifically, the instructions notified the taxpayer to

See Form TD F 90-22.1 to find out if you are considered to have an interest in or signature or other authority over a financial account in a foreign country (such as a bank account, securities account, or other financial account). . . .

(*Id.*)  Finally, the instructions explained that if a taxpayer checks the "Yes" box, then he or she

must file a Form TD F 90-22.1:

*If you checked the "Yes" box on line 7a, file Form TD F 90-22.1 by June 30, [of the following year] with the Department of the Treasury at the address shown on that form.*

(*Id.*) (emphasis added).

Likewise, the instructions for Form TD F 90-22.1 informed taxpayers of who must file a

Form TD F 90-22.1:

**Who must file this Report.**  Each United States person, who has a financial interest in or signature authority, or other authority over any foreign financial accounts, including bank, securities, or other types of financial accounts in a foreign country, if the aggregate value of the foreign financial account exceeds $10,000 at any time during the calendar year. . . .

**Financial Interest.**  A financial interest in a bank, securities, or other financial account in a foreign country means an interest described [as follows]:

1. A United States person has a financial interest in each account for which such person is the owner of record or has legal title, whether the account is maintained for his or her own benefit or for the benefit of others including non-United States persons.

(Def. Ex. 28 at 3; *accord* Ex. 29 at 6.)

Notwithstanding the question and instructions on the form, on her 2007 individual income tax return, and indeed going back to at least 2003, the "no" box was checked in response to the question in line 7a in Part III of Schedule B. (Stip. ¶ 48.) This answer was false. (*See* Stip. ¶ 11, 32.)

IV.   Offshore Voluntary Disclosure Program

The United States began an investigation of the role played by UBS in facilitating tax evasion by U.S. taxpayers, such as Mrs. Kimble, who concealed their assets in secret UBS accounts. In 2008, Mrs. Kimble learned that the United States was "putting pressure on UBS to reveal the names of people who had secret accounts in UBS." (Alice Tr. 55:10-13.) The investigation culminated in a deferred prosecution agreement between UBS and the United States in which UBS admitted that certain private bankers had aided their clients in evading U.S. taxes and agreed to provide the identities and account information of its U.S. clients to the U.S. government. (Def. Ex. 33 ¶ 2.)

Around the time that UBS entered into the deferred prosecution agreement, Mrs. Kimble decided to seek admittance to the IRS's Offshore Voluntary Disclosure Program ("OVDP"). OVDP is a voluntary disclosure program specifically designed for taxpayers with exposure to potential criminal liability, substantial civil penalties, or both due to a willful failure to report foreign financial assets and pay all tax due in respect of those assets. (Def. Ex. 33.) OVDP is designed to provide to those taxpayers (1) protection from criminal liability and (2) terms for resolving their civil tax and penalty obligations. (*Id.*)

Mrs. Kimble was accepted into the OVDP on October 16, 2009.  (Stip. ¶ 64.)  As part of her acceptance into the OVDP, Mrs. Kimble was required, for the prior six years, to file FBARs, to amend her income tax returns to report all undisclosed foreign income, and to pay any tax liability due on the amended returns.  (Def. Ex. 34 at 201.)  Mrs. Kimble was also required to pay a "Miscellaneous Offshore Penalty" equal to 20% of the highest balance in her foreign bank accounts during the prior six years.  (Def. Ex. 34 at 202.)

After her entrance to the OVDP, plaintiff belatedly filed the FBARs for 2003 through 2008.  (Stip. ¶ 62.)  On those late-filed FBARs, plaintiff reported that she had two foreign accounts: the UBS Account in Switzerland and the HSBC account in France.  (Stip. ¶ 63.)

Additionally, plaintiff filed Forms 1040X, Amended U.S. Individual Income Tax Returns, for tax years 2003 through 2008, as required by the terms of her participation in the OVDP.  (Stip. ¶ 51.)  On each amended return, Mrs. Kimble reported that she had underpaid her taxes on her original income tax returns.  (*See* Stip. ¶¶ 52-57.)  Mrs. Kimble reported the following underpayments:

| Tax Year | Underpayment Amount |
|----------|---------------------|
| 2003 | $14,564 |
| 2004 | $9,473 |
| 2005 | $11,165 |
| 2006 | $25,643 |
| 2007 | $26,391 |
| 2008 | $12,130 |

(*Id.*)  Plaintiff's underpayment for each year was attributable solely to the unreported foreign interest income from her accounts at UBS and HSBC.[7]  (Stip. ¶ 58.)

_____

[7] Although Mrs. Kimble disclosed her foreign income on the amended returns, for tax years 2003 through 2006 and 2008, she did not amend her answer to the question 7(a) on Schedule B,

(continued...)

Additionally, the IRS proposed assessing the Miscellaneous Offshore Penalty of $377,309, which is calculated as 20% of the highest balance in the foreign accounts from the prior 6 years.  (Ex. 34 at 202, ¶ 3.)  Mrs. Kimble, however, balked at paying this penalty.  (*See* Alice Tr. 103:8-11.)  Instead, she sought to opt out of OVDP and "take her chances" with the government.  (*See* Alice Tr. 113:10-20.)  After indicating her desire to opt out of the program, the IRS sent Mrs. Kimble a letter informing her that the election to opt out is irrevocable and included a list of questions and answers that informed plaintiff that she could be assessed a higher penalty if the IRS were to audit her FBAR compliance. (Stip. ¶ 65.)  In February, 2013, Mrs. Kimble's opt-out of OVDP was processed with no penalty assessed against her.

V.    The IRS Audit and the Current Litigation

After Mrs. Kimble opted out of OVDP, the IRS opened an examination of her FBAR filings for the 2007 calendar year.  (Stip. ¶ 67.)  During the audit, the Revenue Agent assigned to the case, Melissa Irons, gathered internal records, requested and reviewed documents from Mrs. Kimble, and conducted an interview of Mrs. Kimble.  (Irons Decl. at 0027-0028.)  At the conclusion of the audit, the IRS determined that Mrs. Kimble's failure to file the FBAR for 2007 was willful.  (Irons Decl. at 0030.)  On April 7, 2014, the IRS issued Letter 3709, proposing assessment of a penalty under 31 U.S.C. 5321(a)(5) for willful failure to file TD F 90-22.1 ("the FBAR penalty"), for 2007 in the amount of $697,229.  (Stip. ¶ 68.)

In calculating the FBAR penalties, the IRS applied the mitigation provisions of the Internal Revenue Manual § 4.26.16.4.6.  (Irons Decl. at 0025.)  The FBAR penalty was

---

(…continued)

Interest and Ordinary Dividends, Part III, Foreign Accounts and Trusts.  During her deposition, Mrs. Kimble was unable to explain why she did not check the correct box.  (Alice Tr. 82:15-19.)

calculated as follows:  (1) as to the UBS Account: 50% of the closing balance in the account as of the last day for filing the FBAR (*i.e.*, June 30, 2008) [$1,365,663.54 x 50% = $682,832]; (2) as to the HSBC Account: 10% of the maximum balance in U.S. dollars during the calendar year [$143,974.13 x 10% = $14,397].  (Irons Decl. at 0037.)

On July 15, 2016, the IRS assessed an FBAR penalty in the amount of $697,229.  (Stip. ¶ 69.)  On August 3, 2016, Mrs. Kimble paid the full amount of the FBAR penalty.  (Stip. ¶ 70.) She then filed suit in this Court on March 24, 2017.  (*See* Compl.)

## SUMMARY JUDGMENT STANDARD

Rule 56 of the Rules of the Court of Federal Claims ("RCFC" or "Rules") permits summary judgment if no genuine dispute exists regarding any material fact and the moving party is entitled to judgment as a matter of law.  The movant must initially show an absence of an issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).  A fact is material if it affects the outcome of the case under the governing law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute over a material fact is not genuine if, were the case to go to trial, no rational trier of fact could find for the nonmoving party.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  The movant may satisfy its burden by showing an absence of evidence supporting the nonmoving party's case.  *Celotex*, 477 U.S. at 325. The Court then functions "not to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."  *Anderson*, 477 U.S. at 249.

## ARGUMENT

### I.     Statutory and Regulatory Framework for the FBAR Penalty.

The legal background of (1) the requirement to report foreign financial accounts, including penalties for noncompliance, and (2) the judicial review standards with respect to FBAR penalties are as follows:

#### A.     The requirement to report foreign financial accounts.

The requirement to report interests in foreign bank accounts arises under the Bank Secrecy Act, codified at 31 U.S.C. §§ 5311 *et seq*., which was designed in part as a means to combat tax evasion.  *See* H.R. Rep. No. 91-975 (1970), *reprinted in* 1970 U.S.C.C.A.N. 4394, 4397-98 (observing that "[s]ecret foreign financial facilities, particularly in Switzerland" offered the wealthy a "grossly unfair" but "convenient avenue of tax evasion").

31 U.S.C. § 5314 instructs the Secretary of the Treasury to require U.S. citizens to keep records, file reports, or both, when the citizen "makes a transaction or maintains a relation . . . with a foreign financial agency."  31 U.S.C. § 5314(a).  In turn, the Secretary published regulations requiring any citizen "having a financial interest in, or signature or other authority over, a bank, securities or other financial account in a foreign country" to report certain details about the account to the Treasury Department.  31 C.F.R. § 103.24 (2009).  The report must be made each year by filing a form with the Treasury Department no later than June 30 of the following year.  *See* 31 C.F.R. § 103.27(c), (d), (e) (2009).

To alert citizens to the filing requirement, Schedule B of each year's Form 1040 contains the following check-the-box question:

| Part III Foreign Accounts and Trusts (See page B-2.) | You must complete this part if you **(a)** had over $1,500 of taxable interest or ordinary dividends; or **(b)** had a foreign account; or **(c)** received a distribution from, or were a grantor of, or a transferor to, a foreign trust. | Yes | No |
|---|---|---|---|
| | **7a** At any time during 2007, did you have an interest in or a signature or other authority over a financial account in a foreign country, such as a bank account, securities account, or other financial account? See page B-2 for exceptions and filing requirements for Form TD F 90-22.1 . . . . . . . | | |
| | **b** If "Yes," enter the name of the foreign country ▶ ------------------------------------------- | | |
| | **8** During 2007, did you receive a distribution from, or were you the grantor of, or transferor to, a foreign trust? If "Yes," you may have to file Form 3520. See page B-2 . . . . . . . | | |

(*E.g.*, Def. Ex. 13 at 82.)  The instructions for Schedule B for Form 1040 require the filer to check "Yes" on Line 7a if the filer "had a financial interest in or signature authority over a financial account located in a foreign country."  (*See* Def. Ex. 27 at 137.)  And if the "Yes" box on Line 7a is checked, the filer must also submit a separate report on Form TD F 90-22.1—the FBAR.  (*E.g.*, Def. Ex. 13.)  Furthermore, the Form 1040 instructions refer the reader to the FBAR form "to find out if you are considered to have an interest in or signature or other authority over a financial account in a foreign country."  (*Id.*)  In turn, the instructions for the FBAR lay out the filing requirements, including that any U.S. person with financial interest in or signature authority over an account must file the FBAR.  (*Id.*)

To enforce the reporting requirements, § 5321 provides for the imposition of a civil money penalty on a person who fails to file an FBAR.  31 U.S.C. § 5321(a)(5)(A).  (The Secretary has delegated assessment authority to the IRS.  31 C.F.R. § 103.56(g) (2009); *see also* 31 C.F.R. § 1010.810(g) (2014).)  Except where the violation is willful, the maximum amount of the penalty is $10,000.  *See* § 5321(a)(5)(B)(i), (C).  Where the violation is willful, however, the amount of the penalty is the greater of: (1) $100,000, or (2) fifty percent of the "balance in the account at the time of the violation."  31 U.S.C. § 5321(a)(5)(C), (a)(5)(D).

### B.    Judicial review of the FBAR penalty.

The FBAR statute does not indicate the standard to be applied when reviewing an individual's liability for the FBAR penalty.  Courts previously addressing this issue have reviewed an accountholder's liability for the FBAR penalty *de novo*.  *See United States v.*

*Williams (Williams I)*, No. 09-437, 2010 WL 3473311, at *1 (E.D. Va. Sept. 1, 2010), *rev'd on other grounds* 489 Fed. App'x 655, 659 (4th Cir. 2012).  In *Williams*, the court was persuaded that "the general rule is that it is a decision based on the merits of the case and not on any record developed at the administrative level." *Id.*  Furthermore, the court found a *de novo* standard "appropriate given that 31 U.S.C. § 5321 provides for no adjudicatory hearing before an FBAR penalty is assessed." *Id.*; *cf. United States v. Healy Tibbitts Constr. Co.*, 713 F.2d 1469, 1475 (9th Cir. 1983) ("where, as here, the statute *contemplates a full adjudicatory hearing before the agency*, a court trial *de novo* is inappropriate" (emphasis added)).  Therefore, the Court should determine *de novo* Mrs. Kimble's liability for the penalty.

With respect the assessment amount, however, the statute gives the Secretary broad discretion to make a determination: it merely states that the maximum penalty imposed is the greater of: (1) $100,000, or (2) fifty percent of the "balance in the account at the time of the violation." 31 U.S.C. § 5321(a)(5)(C), (a)(5)(D).  Because the Secretary has discretion to set the penalty amount, courts previously addressing this issue have reviewed the assessment to determine whether the amount is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *See United States v. Williams (Williams III)*, No. 09-437, 2014 WL 3746497, at *1 (E.D. Va. Jun. 26, 2014) (holding that the court would review penalty amount for an abuse of discretion); *see also Moore v. United States (Moore I)*, 2015 WL 1510007, at *9 (W.D. Wa. Apr. 1, 2015) (reviewing the amount of a non-willful penalty for abuse of discretion).  Therefore, the Court should determine whether the IRS abused its discretion in determining the amount of the FBAR penalty.

In short, the Court should decide *de novo* whether Mrs. Kimble is liable for the FBAR penalty, but it should review only for an abuse of discretion the amount of the assessment.

## II.     Mrs. Kimble Is Liable for a Willful FBAR Penalty for 2007.

### A.     Mrs. Kimble had a foreign bank account in 2007 and was therefore required to file an FBAR no later than June 30, 2008.

Under the governing regulations, a "person subject to the jurisdiction of the United States . . . having an interest in, or signature authority" over a foreign financial account with a value exceeding $10,000 during a calendar year, must file an FBAR by June 30 of the next calendar year.  31 C.F.R. §§ 103.24(a), 103.27(c).  It cannot be disputed that this requirement applied to Mrs. Kimble for the 2007 calendar year.  *First*, as a U.S. citizen, Mrs. Kimble was "under the jurisdiction of the United States."  (Stip. ¶ 1.)  *Second*, during 2007, Mrs. Kimble had both an interest in and signatory authority over her accounts at both UBS and HSBC.  (Stip. ¶¶ 11, 32.)  *Third*, because the UBS account was located in Switzerland and the HSBC account was located in France, the accounts at issue were foreign financial accounts.  (*Id.*)  *Fourth*, the balances in both accounts—$1.5 million at UBS and $144,000 at HSBC—were far in excess of $10,000.  (Stip. ¶¶ 31, 40.)  Mrs. Kimble does not dispute these facts.

### B.     Mrs. Kimble willfully failed to file an FBAR for the 2007 calendar year.

It is further undisputed that Mrs. Kimble did not file an FBAR for the 2007 year on or before June 30, 2008, as the regulations required.  (Stip. ¶ 61.)  Rather, Mrs. Kimble appears to challenge whether she acted "willfully" within the meaning of 31 U.S.C. § 5321(a)(5) with respect to her UBS account.  Mrs. Kimble does not challenge that she acted willfully in her failure to file the FBAR for her HSBC account, however.  (Ex. 30 at 154, ¶ 40 ("Plaintiff admits that Plaintiff does not dispute the FBAR penalty for the HSBC account referenced above.").)  Accordingly, the discussion below focuses solely on the UBS Account.

The text of the statute does not define the term "willful" or "willfully."  31 U.S.C. § 5321(a)(5).  When interpreting the term in other contexts, the Supreme Court has held that

"'willfully' is a word of many meanings whose construction is often dependent on the context in which it appears." *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 57 (2007).  Courts have outlined three standards for willfulness in the FBAR context.  These standards are in the alternative, that is, if the taxpayer's situation meets even one of them, willfulness would be established.  The standards are: (1) failing to comply with a legal duty voluntarily rather than accidentally; (2) willful blindness to a legal duty and the attendant facts; and (3) reckless disregard of a legal duty.  Under any of the three standards, the government can show willfulness "through inference from conduct meant to conceal or mislead sources of income or financial information." *United States v. McBride*, 908 F. Supp. 2d 1186, 1210 (D. Utah 2012) (quoting *United States v. Sturman*, 951 F.2d 1466, 1476–77 (6th Cir. 1991)).  Drawing on circumstantial evidence and reasonable inferences is often necessary "because direct proof of the [violator]'s intent is rarely available." *Id.*

Defendant will show, based on undisputed evidence, that Mrs. Kimble's conduct was willful under all three of the alternative standards.  Mrs. Kimble acted voluntarily in failing to disclose her UBS account to the United States.  She was willfully blind to her duty to file an FBAR.  And, she knew or should have known of the FBAR requirement and acted recklessly in failing to file it.

> **1.    Voluntariness: Mrs. Kimble's failure to file her FBAR was voluntary, rather than accidental.**

Courts have found willfulness in the FBAR context where there is a "voluntary, rather than accidental or unconscious" decision by a taxpayer not to file the report. *McBride*, 908 F. Supp. 2d at 1205 (*citing Lefcourt v. United States*, 125 F.3d 79, 83 (2d Cir. 1997)); *see also Estate of Liftin v. United States*, 111 Fed. Cl. 13, 19 (2013) (citing *United States v. Boyle*, 469 U.S. 241, 245 (1985)) (stating that willful neglect in a failure to file case is "conscious,

intentional failure or reckless indifference"), *aff'd*, 754 F.3d 975 (Fed. Cir. 2014).  Mrs. Kimble

knew that she was engaged in a plan to conceal her UBS Account from the U.S. government.

She admitted on the record that she intended for the account to remain a secret from everyone,

including the government.  Moreover, Mrs. Kimble herself took numerous intentional steps to

keep her UBS Account secret, including maintaining the account as a so-called numbered

account and failing to pay income taxes on the earnings from the account.

> a.       **By virtue of her having signed her federal income tax return,
> Mrs. Kimble is charged with knowledge of the FBAR reporting
> requirement.**

As a matter of law, all taxpayers who sign and file a federal income tax return know or

should know about the requirement to file an FBAR.  *See Jarnagin v. United States*, 134 Fed. Cl.

368, 378 (2017).  "It is well established that taxpayers are charged with the knowledge,

awareness, and responsibility for their tax returns, signed under penalties of perjury, and

submitted to the IRS."  *McBride*, 908 F. Supp. 2d at 1206 (citing cases).  Courts have also long

held that "'individuals are charged with knowledge of the contents of documents they sign—that

is, they have "constructive knowledge" of these documents.'"  *Id.* (quoting *Consol. Edison Co. of

N.Y., Inc. v. United States*, 221 F.3d 364, 371 (2d Cir. 2000)); *accord Jarnagin*, 134 Fed. Cl. at

378.  As a corollary to this notion, "[a] taxpayer who signs a tax return will not be heard to claim

innocence for not having actually read the return, as he or she is charged with constructive

knowledge of its contents."  *United States v. Williams (Williams II)*, 489 Fed. App'x 655, 659

(4th Cir. 2012) (quoting *Greer v. Commissioner*, 595 F.3d 338, 347 n.4 (6th Cir. 2010)).

Moreover, the disregard of a taxpayer's duties cannot "defeat the statutory liability fixed upon

responsible persons by pleading that he did not know what he was signing and that his action

was therefore not 'willful'."  *Burack v. United States*, 198 Ct. Cl. 855 (1972).  Thus, the act of

signing the return puts a taxpayer on notice of the contents of the entire return, as it would for any other document, and a taxpayer's failure to review the return is of no import.

As discussed above, Schedule B, Part III, Line 7a, of a Form 1040 contains a question asking "[a]t any time during [a particular year], did you have an interest in or a signature or other authority over a financial account in a foreign country, such as a bank account, securities account, or other financial account? See page B-2 for exceptions and filing requirements for Form TD F 90-22.1."  This simple yes-or-no question "makes it inconceivable that [a taxpayer] could have misinterpreted this question." *McBride*, 908 F. Supp. 2d at 1208 (quoting *Thomas v. UBS AG*, No. 11C4798, 2012 WL 239866, *5 n.2 (N.D. Ill. June. 21, 2012)) (alteration in original).

In *McBride*, the district court found that the taxpayer's failure to file an FBAR was voluntary and not accidental. *Id.* at 1213.  The district court reasoned that the taxpayer had signed his tax returns, which provided him with constructive knowledge of his duty to file the FBAR. *Id.*  But the taxpayer there chose not to disclose his interests in foreign accounts. *Id.* The fact that the taxpayer had a mistaken belief that he did not need to disclose his foreign accounts was irrelevant. *Id.* (quoting *Lefcourt*, 125 F.3d at 83).  All that mattered "is whether the law required its disclosure" and whether he voluntarily failed to comply.  *Id.* (quoting *Lefcourt*, 125 F.3d at 83).

Here, Mrs. Kimble had constructive knowledge of the FBAR requirement.  On her 2007 income tax return, Mrs. Kimble signed and declared, "[u]nder penalties of perjury," that she had "examined the return and accompanying schedules and statements, and to the best of [her] knowledge and belief, they are true, correct, and complete." (*See* Def. Ex. 13 at 80.)  However, Mrs. Kimble represented that she had no interests in foreign bank accounts on Schedule B of the

return, which also informed her of the existence of "filing requirements for Form TD F 90-22.1."

(*Id.*)  Thus, even if Mrs. Kimble may not have had actual knowledge of the FBAR filing

requirement, the tax return provided her with, at least, constructive knowledge of it.

At a minimum, if Mrs. Kimble had reviewed her Form 1040, she would have plainly seen

the foreign account question and instructions on line 7a of Part III of Schedule B of Form 1040.

These instructions in turn provide an explanation of the FBAR filing requirements.  (*Id.*)  Thus,

both the yes-or-no question on line 7a and the instructions referred to by line 7a would have put

Mrs. Kimble "on inquiry notice of the FBAR requirement."  *Williams II*, 489 Fed. App'x at 659;

*accord McBride*, 908 F. Supp. at 1206.

> **b.     Mrs. Kimble had knowledge of her obligation to file the FBAR,
>            and failed to do so.**

Mrs. Kimble had constructive knowledge of the FBAR requirement, because she signed

her original 2007 tax return, which included the question on foreign bank accounts on Schedule

B.  (Def. Ex. 13 at 82.)  Thus, as in *McBride*, Mrs. Kimble knew she had a foreign bank account

and a duty to report that account.  Yet, even with that knowledge, Mrs. Kimble chose not to file a

2007 FBAR by June 30, 2008.  The facts surrounding her concealment of the UBS Account

serve as further evidence that her failure to file the FBAR was intentional rather than accidental.

*First*, in her deposition, Mrs. Kimble admitted to keeping the UBS Account a secret from

everyone, including the U.S. government.  (Alice Tr. 116:6-19.)  Mrs. Kimble didn't pay income

taxes on the UBS Account earnings because that would have notified the government of her

foreign account.  (*See* Alice Tr. 71:20-24, 116:6-19.)  *The admissions on the record alone are*

*sufficient to demonstrate that Mrs. Kimble was willful in her failure to file the FBAR.*  Mrs.

Kimble had constructive knowledge of the FBAR filing requirement and intentionally kept the

UBS Account a "total[] secret."

*Second*, the documentary evidence underscores Mrs. Kimble's intent to conceal her accounts.  She maintained a so-called numbered account, for which UBS omitted Mrs. Kimble's name and address from the bank statements.  Mrs. Kimble signed the "Numbered Account Agreement" and the "Basic document for account/custody account relationship," *both of which documents directed UBS to hold all account correspondence*.

*Third*, the UBS Account was shrouded in secrecy, with the number of individuals who knew about the account strictly limited.  And, the individuals who did know about the UBS Account knew to keep it a secret.  Mrs. Kimble learned about the UBS Account from her parents, and, when she learned about the account, her father instructed her to "never tell anybody about th[e] account."  Mrs. Kimble's father disclosed the account to Michael Kimble, but years after he married Mrs. Kimble.  He, too, was directed to keep the account secret.  Indeed, the UBS Account was so secretive that Mr. Kimble, although he knew about the UBS Account, did not know Mrs. Kimble was a co-owner of the account until shortly before their divorce—many years after he first learned about the account.  After her father passed away, Mrs. Kimble disclosed the account to her son, David.  In doing so, she directed him to keep the account "totally secret."

*Fourth*, Mrs. Kimble chose not to disclose the UBS account or the earnings therefrom to her accountant, Steven Weinstein.  (Stip. ¶ 43.)  Had she done so, Mr. Weinstein could have helped her file FBARs or take proper corrective action.  However, as Mrs. Kimble admitted, she didn't tell Mr. Weinstein about her UBS Account because "that was secret money."  (Alice Tr. 71:20-24.)

*Lastly*, the response by Mrs. Kimble to the investigation of UBS by U.S. authorities also shows that her failure to file was voluntary and not accidental.  In 2008, when the government's investigation of UBS was advancing, Mrs. Kimble sought to avail herself of the OVDP.  As Mrs.

Kimble admitted in her deposition, she was "breaking the law" by not paying taxes on the

income earned in the UBS Account.  (Alice Tr. 57:10-13.)  This admission evidences a voluntary

decision by Mrs. Kimble to conceal her foreign account from U.S. authorities, rather than an

accidental failure to file the requisite report.

> **2.   Willful Blindness: Mrs. Kimble acted with willful blindness to her duty
>        to file a timely FBAR.**

To allow an individual to claim she was subjectively unaware of either the FBAR

requirement or the relevant facts by intentionally avoiding such knowledge would undermine the

enforcement value of the civil FBAR penalty.  (*See* Compl. ¶ 12.)  For that reason, the

government may prove that a taxpayer acted willfully without showing actual knowledge if he or

she exhibited willful blindness.  *McBride*, 908 F. Supp. 2d at 1210.  To be willfully blind "a

[person] must subjectively believe that there is a high probability that a fact exists and the

[person] must take deliberate actions to avoid learning of that fact."  *Id.* (quoting *Global-Tech

Appliances, Inc. v. SEB S.A.*, 563 U.S. 754, 769–70 (2011)); *cf. Kobus v. United States*, 103 Fed.

Cl. 575, 588 (2012) (in trust-fund recovery case, a responsible person may not "immunize

himself from the consequences of his actions by wearing blinders which will shut out all

knowledge of the liability for and the nonpayment of his withholding taxes").

In *McBride*, the district court found that the taxpayer was willfully blind to an obvious

risk of failing to comply with the FBAR requirement, and thus willful in his failure to file an

FBAR.  *McBride*, 908 F. Supp. 2d at 1210–14.  In reaching this conclusion, the district court

held that the taxpayer's deliberately engineered investment arrangement and conversations with

others had put him on notice that he had legal risk in connection with his foreign accounts.

*Id.* at 1210–11.  The fact that the taxpayer's returns in *McBride* had the obvious question

regarding foreign accounts on Schedule B served to notify the taxpayer about the risk of failing

to comply.  *Id.* at 1211.  The taxpayer's decision to sign his return without understanding its contents constituted willful blindness.  *Id.* at 1212–13.  Additionally, the taxpayer had made himself willfully blind by failing to disclose all relevant information to the accountant that prepared his return.  *Id.*

As in *McBride*, the undisputed evidence here shows that Mrs. Kimble acted with willful blindness of her obligation to file the FBAR.  *First*, Mrs. Kimble's UBS Account was a numbered account, which did not directly have her name attached (Def. Exs. 7-9), and none of the bank statements included her name.  (*Id.*)  This allowed the account to remain quasi-anonymous; it hid Mrs. Kimble's identity as the owner from outsiders.  *Second*, Mrs. Kimble signed a declaration stating that she was liable for U.S. tax as a U.S. person.  (Def. Ex. 3.)  Mrs. Kimble did not invest in U.S. securities.[8]  (*See* Def. Exs. 8-9.)  Had Mrs. Kimble invested in U.S. securities, UBS might have been required to withhold U.S. taxes, which would trigger U.S. reporting requirements.  (*See* Def. Ex. 3 at 3.)  *Third*, it was only as UBS began cooperating with U.S. authorities that Mrs. Kimble decided to enter OVDP.  Mrs. Kimble's entrance to OVDP evidences her subjective concern regarding her potential legal liabilities to the United States.

Mrs. Kimble took deliberate steps to blind herself from knowledge of the FBAR requirement itself and of the facts that might trigger the requirement.  As in *McBride*, Mrs. Kimble claimed that she never read the obvious question regarding foreign accounts on Schedule B of her tax returns.  (Stip. ¶ 46.)  Mrs. Kimble also claimed that she did not read any of the documents she signed related to her UBS accounts prior to signing them.  (Alice Tr. 118:5-9.)

---

[8] Although UBS bank statements indicate that Mrs. Kimble had financial positions in U.S. dollars, the investments were not in U.S. securities; rather, they were dollar-denominated funds managed outside the United States.

Thus, Mrs. Kimble deliberately hid from key facts that would have revealed her obligation to file an FBAR for the 2007 year.

Furthermore, as in *McBride*, Mrs. Kimble's failure to inform her accountant about the existence of the UBS Account evidences her willful blindness.  Although Mrs. Kimble's UBS Account earned income for longer than Mr. Weinstein was her accountant, she never told him about the foreign bank account or that she had earned foreign income in connection with the account. She only notified Mr. Weinstein of her foreign accounts after she entered the OVDP so that he could prepare amended income tax returns.  Had Mrs. Kimble notified her accountant of the existence of either account, he could have prepared correct income tax returns, and could have notified her of the FBAR filing requirement (to the extent she didn't already know about it). Mrs. Kimble's failure to inform her accountant about her UBS Account or her HSBC Account demonstrates her effort to blind herself from her legal obligations under U.S. law.

### 3.  Reckless Disregard: Mrs. Kimble recklessly disregarded her duty to file a 2007 FBAR.

In the case of *Safeco Ins. Co. v. Burr*, 551 U.S. 47 (2007), the Supreme Court held that, for statutory civil liability, it has "generally taken [willfulness] to cover not only knowing violations of a standard, but reckless ones as well."  *Id.* at 57. The government can establish willfulness by showing "the individual's reckless disregard of a statutory duty." *McBride*, 908 F. Supp. 2d at 1204 (citing *Safeco Ins. Co.*, 551 U.S. at 57); *see* Memorandum and Order, *United States v. Garrity*, No. 15-243, 2018 WL 1611387 (D. Conn. April 3, 2018); *cf. Kobus*, 103 Fed Cl. at 588 (holding that a taxpayer may act "willfully" under I.R.C. § 6672 if "he acts with a reckless disregard of the facts and obvious and known risks that presently-due withholding taxes are not being paid").  The government does not need to show "an improper motive or bad purpose" to sustain a willfulness civil FBAR penalty.  *McBride*, 908 F. Supp. 2d at 1204.

Reckless disregard, in turn, occurs when "'the facts and circumstances of a particular case, taken as a whole, demonstrate' that the taxpayer 'knew or should have known that there was a risk [of noncompliance] and failed to take available corrective action,' with the result being the violation of the law." *Id.* at 1209 (quoting *Jenkins v. United States*, 101 Fed. Cl. 122, 134 (2011), internal quotation marks omitted, alteration in original).

With constructive knowledge of the requirement to file the FBAR, *see supra* II.B.1.a, Mrs. Kimble acted recklessly in numerous ways. *First*, even though she knew that she had a foreign account and the requirement to file an FBAR disclosing the account, she checked the "No" box on Schedule B of her return and failed to file an FBAR before June 30, 2008. (Def. Ex. 13 at 82; Stip. ¶ 61.)  Indeed, three recent cases have held that taxpayers acted recklessly where they signed tax returns answering the question "No," despite knowledge that they had interests in foreign bank accounts. *See McBride*, 908 F. Supp. 2d at 1211; *Williams II*, 489 Fed. App'x at 659; *United States v. Bohanec*, No. 15-4347, 2016 WL 7167860 at *5 (C.D. Cal. Dec. 8, 2016).[9] *Second*, like the defendant in *McBride*, Mrs. Kimble signed "under penalties of perjury" that the she had reviewed her return and that all the statements contained within "were complete and accurate," when in fact, she did not review her return, and the return falsely stated that she had no foreign accounts.  (*See* Def. Ex. 13 at 80.)  *Third*, like the defendants in *Williams* and *Bohanec*, Mrs. Kimble acted recklessly by signing and filing her return without reviewing it. (Stip. ¶ 46.)  These undisputed facts, by themselves, support a determination that Mrs. Kimble acted willfully, which the Court may reach on summary judgment rather than at trial.

---

[9] A fourth recent case, *Bedrosian v. United States*, No. 15-5853, 2017 WL 3887520 (E.D. Pa. Sept. 5, 2017), held that the taxpayer there had not acted willfully under 31 U.S.C. § 5321(a)(5). That case is pending on appeal. *Bedrosian v. United States*, appeal docketed, No. 17-3525 (3d Cir. Nov. 21, 2017).

Mrs. Kimble's lack of candor with and full disclosure to her accountant, Mr. Weinstein, bolsters the conclusion that Mrs. Kimble was reckless and willful in her failure to file the FBAR. Mrs. Kimble's failure to provide candid and complete information to Mr. Weinstein demonstrates her recklessness.  By her own admission, for the 2007 tax year, she provided Mr. Weinstein with her U.S. income information, asked him to put together her return, and signed and filed the return without review.  (Alice Tr. 74:15-22; Weinstein Tr.[10] 20:8-21:2; Stip. ¶ 46.) This was the same process each year.  Mrs. Kimble never informed Mr. Weinstein of the UBS Account or the HSBC Account before he prepared her original 2007 return. (Stip. ¶ 43.)  This led Mr. Weinstein to prepare a return with the question on Schedule B marked "No." (*See* Def. Exs. 10-14.)  By contrast, if Mrs. Kimble had informed Mr. Weinstein of her foreign accounts, he could have advised her to report it.

It is also clear that Mrs. Kimble never advised Mr. Weinstein of foreign-sourced interest, dividends, and capital gains that she earned in 2007, which were omitted from her original 2007 return.  (Stip. ¶ 43; *Compare* Def. Ex. 13 at 82 *with* Def. Ex. 19 at 114.)  If Mrs. Kimble had been candid with Mr. Weinstein about the foreign income she earned from her foreign accounts, he could have advised her of her FBAR obligations in connection with that account.  Yet, it was only after she entered the OVDP that Mrs. Kimble revealed the foreign bank accounts to Mr. Weinstein.  (Stip. ¶ 43; *see* Stip. ¶ 64.)  Taken together, Mrs. Kimble's constructive knowledge of the FBAR filing requirements, along with the numerous misstatements and omissions on her tax returns and her lack of candor with her accountant constitute evidence of her awareness that

---

[10] References to "Weinstein Tr." are to the transcript of the deposition of Steven Weinstein at Exhibit 37.

her ownership of the UBS account was wrongful in some respect under U.S. law, which, in turn, supports a determination that she acted recklessly in failing to file the FBAR.

## III. The Amount of the Penalty Imposed Against Plaintiff Was an Appropriate Exercise of the IRS's Discretion.

Plaintiff claims that the IRS acted arbitrarily and capriciously in an abuse of its discretion when it assessed plaintiff with the FBAR penalty of 50% of the account balance for the UBS Account and 10% of the account balance for the HSBC Account.[11]  (*See* Compl. ¶ 11.)  She is incorrect.  The FBAR penalties assessed against plaintiff were an appropriate exercise of the IRS's discretion, and the penalties are proportionate to Mrs. Kimble's failure to report her two foreign accounts—and the income therefrom—for many years.

Congress granted to the Secretary of the Treasury the discretion to impose the FBAR penalty and the amount of that penalty (up to a statutory ceiling).  31 U.S.C. § 5321(a)(5); *Williams III*, 2014 WL 3746497, at *2 (explaining that downward departures from the statutory maximum of the FBAR penalty are within the agency's discretion).  For the willful violation of the requirement to file an FBAR, the Secretary of the Treasury may impose a civil penalty up to the greater of $100,000 or 50% of the balance in the account at the time of the violation. § 5321(a)(5)(C).  (The Secretary delegated assessment authority to the IRS.  31 C.F.R. § 103.56(g) (2009); *see also* 31 C.F.R. § 1010.810(g) (2014).)

The IRS developed internal guidelines to aid examiners in the exercise of their discretion. *See* I.R.M. pt. 4.26.16. (July 1, 2008).  The Internal Revenue Manual ("I.R.M.") provides that the examiner is "expected to exercise discretion, taking into account the facts and circumstances of

---

[11] In response to a request for admission, plaintiff admitted that she is liable for the willful FBAR penalty on the HSBC Account and is not seeking the recovery of the FBAR penalty imposed on that account.  (Def. Ex. 30 at 154, ¶¶ 40-41.)

each case, in determining whether penalties should be asserted and the total amount of penalties

to be asserted." I.R.M. pt. 4.26.16.4(6). The examiner can weigh factors such as whether

compliance objectives would be achieved by a warning letter and the nature of the violation and

the amounts involved. I.R.M. pt. 4.26.16.4.7(3). Because the examiner may impose multiple

FBAR penalties or separate FBAR penalties with respect to a single FBAR form, the I.R.M.

provides that the examiner should only consider imposing multiple FBAR penalties "in the most

egregious cases." I.R.M. pt. 4.26.16.4.7(4). All of these downward departures, however, are

based on the IRS's view of the facts of the case. In short, "[a]lthough the IRS *may* impose a

lower penalty where the violating taxpayer meets certain criteria, … such departures are within

the discretion of the agency." *Williams III*, 2014 WL 3746497, at *2.

Additionally, the IRS developed a set of mitigation guidelines to assist examiners in the

exercise of their discretion. *See* I.R.M. pt. 4.26.16.4.6. If an accountholder qualifies for the

mitigation guidelines, that accountholder may be subject to a reduced FBAR penalty. I.R.M. pt.

4.26.16.4.6.1(1). The mitigation guidelines are intended to "promote consistency by Service

employees in exercising this discretion for similarly situated persons." I.R.M. pt. 4.26.16.4.6(2).

For the mitigation to apply, the accountholder must satisfy four threshold conditions:

1.  the accountholder has no history of past FBAR penalty assessments and criminal tax or Bank Secrecy Act convictions for the preceding ten years;

2.  no money passing through the foreign bank accounts was from an illegal source or used to further a criminal purpose;

3.  the accountholder cooperated during the examination; and

4.  the IRS did not determine a civil fraud penalty against the person for an underpayment for the year in question due to the failure to report income related to any amount in a foreign account.

*See* I.R.M. pt. 4.26.16.4.6.1(2)-(3); *see also* I.R.M. Exhibit 4.26.16-2.

29

If the threshold conditions are satisfied, the examiner applies the mitigation guidelines to determine the amount of the penalty.  I.R.M. pt. 4.26.16.4.6.3.  For the willful FBAR penalty, the mitigation guidelines provide four penalty levels depending on the highest maximum balance in the account:

| Mitigation Level | Maximum Balance | Penalty Amount is the Greater of |
|---|---|---|
| Level I | ≤ $50,000 | $1,000 per violation or 5% maximum aggregate balance during year |
| Level II | $50,001–$250,000 | $5,000 per violation or 10% each maximum account balance during year |
| Level III | $250,001–$1,000,000 | 10% each maximum account balance during year or 50% account balance on the last day for filing the FBAR |
| Level IV | > $1,000,000 | 50% account balance as of the last day for filing the FBAR or $100,000 |

*Id.*; I.R.M. Exhibit 4.26.16-2.  In short, the mitigation guidelines require the examiner to calculate the aggregate maximum balance of all accounts during the year, and if the account balances exceed $50,000, the penalty level is determined separately for each account.  I.R.M. pt. 4.26.16.4.6.3.

Here, Revenue Agent Irons followed the provisions of the I.R.M. to determine the amount of the penalty.  Revenue Agent Irons analyzed the threshold conditions for mitigation and determined that Mr. Kimble satisfied those conditions.  (Irons Decl. at 0025.)  Upon finding that Mrs. Kimble's failure to file an FBAR for calendar year 2007 was willful, Revenue Agent Irons followed the mitigation guidelines and calculated the balances for the accounts.  (Irons Decl. at 0037.)  Revenue Agent Irons calculated the maximum balance in the HSBC account during the calendar year 2007 in the amount of $143,974 and the balance in the UBS account on the violation date of June 30, 2008, of $1,365,664.  (*Id.*)  Based on the balances, Revenue Agent Irons determined an FBAR penalty of $14,397 for the HSBC account (10 percent of the maximum account balance) and $682,832 for the UBS account (50 percent of the balance in the

30

account on the violation date).  In total, the FBAR penalties for the two accounts were $697,229. (*Id.*)  In other words, by calculating the amount of the FBAR penalty under the mitigation guidelines, Revenue Agent Irons determined that the HSBC account was subject to a lower FBAR penalty than the statutory maximum.  The UBS Account, even under the mitigation guidelines, was nevertheless subject to the statutory maximum.

Because Revenue Agent Irons found that the totality of Mrs. Kimble's conduct met the criteria of an egregious willful violation, Revenue Agent Irons determined that the penalty should not be reduced beyond the mitigation guidelines.  (Irons Decl. at 0030.)  Accordingly, the IRS imposed the maximum penalties in accordance with the mitigation guidelines' penalty structure of the I.R.M.  (Irons Decl. at 0037.)

As explained, the Court should review the amount of penalty under an abuse of discretion standard.  *See Williams III*, 2014 WL 3746497, at *2; *see also Moore v. United States (Moore II)*, 2015 WL 4508688, at *1 (W.D. Wa. July 24, 2015); *Moore I*, 2015 WL 1510007, at *9.  The Court should only overturn the IRS's decision if that decision was arbitrary and capricious.  *See Williams III*, 2014 WL 3746497, at *1; *see also Moore II*, 2015 WL 1510007, at *9.  The Court should not substitute its judgment for that of the IRS.  *See Peck v. Thomas*, 697 F.3d 767, 772 (9th Cir. 2012).  The IRS's decision should be upheld as long as it had a reasonable basis, meaning that the IRS "considered the relevant factors and articulated a rational connection between the facts found and the choices made."  *Id.* (quoting *Arrington v. Daniels*, 516 F.3d 1106, 1112 (9th Cir. 2008)); *see also Williams III*, 2014 WL 3746497, at *1 (applying arbitrary and capricious standard of review).

Revenue Agent Irons was warranted in imposing the maximum penalty under the provisions of the I.R.M.  In determining whether Mrs. Kimble willfully failed to file an FBAR

for 2007, Revenue Agent Irons reviewed the records Mrs. Kimble filed in the OVDP, analyzed

the documents submitted during the audit, and conducted an interview of Mrs. Kimble. (Irons

Decl. at 0027-0028.) Revenue Agent Irons found Mrs. Kimble took considerable efforts to

conceal the existence of her accounts. (Irons Decl. at 0030-0033.) Revenue Agent Irons found

that Mrs. Kimble paid UBS additional fees to hold her mail and only discussed the account with

UBS representatives by phone or in person. (Irons Decl. at 0031, 0378.) Furthermore, based on

the account statements, Revenue Agent Irons determined that Mrs. Kimble needed to have

regular discussions with the bank representatives due to the frequency of the transactions in the

account. (Irons Decl. at 0031.) Revenue Agent Irons found that Mrs. Kimble took additional

efforts to conceal her accounts by failing to disclose the account to her return preparer and

incorrectly checking the "No" box in response to question 7a on Schedule B, Part III. (Irons

Decl. at 0031, 0143, 0147, 0153, 0161, 0167.)

Additionally, Revenue Agent Irons found that Mrs. Kimble significantly underreported

her taxable income attributable to the foreign accounts meanwhile properly reporting similar

domestic income. (Irons Decl. at 0028, 0031; 0178 -0179, 0183-0184, 0187-0188, 0191-0192,

0197-0198, 0204-0205.) For the six years that Mrs. Kimble filed amended returns, Revenue

Agent Irons determined that Mrs. Kimble had underreported her foreign taxable income for each

year. (Irons Decl. at 0028, 0031, 0143.) Specifically, for tax year 2007, Revenue Agent Irons

calculated that Mrs. Kimble underreported her tax by more than 50% due to her failure to report

the foreign taxable income. (*Id.*) Revenue Agent Irons noted the similarity between Mrs.

Kimble's domestic investment income that was properly reported and the unreported foreign

investment income that was not reported. (Irons Decl. at 0031.) Of significance to Revenue

Agent Irons was the Mrs. Kimble's omission of foreign income was not isolated in the six years in which Mrs. Kimble filed amended returns; the omissions spanned decades.  (*Id.*)

Based on the totality of the facts and the standard for willfulness, Revenue Agent Irons found that Mrs. Kimble's actions constituted a willful violation of her statutory duty.  (Irons Decl. at 0030.)  Although the internal guidance authorizes the IRS to impose a lower penalty based on the facts of the case, "such departures are within the discretion of the agency." *Williams III*, 2014 WL 3746497, at *2.  Revenue Agent Irons decided to apply the mitigation guidelines' maximum penalty structure because she found that Mrs. Kimble's actions constituted an egregious willful violation of her duty to file an FBAR.  (Irons Decl. at 0030.)  Indeed, Mrs. Kimble's own statements concerning her intent to keep this account a secret from everyone, including the United States government, further support the IRS's conclusion that her failure to file the FBAR was a willful violation of her statutory duty.  (Alice Tr. 116:6-19.)  Based on the totality of the circumstances, Revenue Agent Irons reasonably determined that the maximum penalty under the internal guidelines, an amount less than the statutory maximum, should be imposed.

The IRS reasonably exercised its discretion in determining the amount of the FBAR penalties.  The amount of the two FBAR penalties is within the range authorized by Congress in § 5321(a)(5)(C) for willful violations.  Revenue Agent Irons reasonably followed the I.R.M. guidelines for determining the amount of FBAR penalties.  Based on the totality of facts found by the IRS, Revenue Agent Irons reasonably determined that Mrs. Kimble's conduct constituted a willful violation of a statutory duty.  Thus, Revenue Agent Irons had a rational basis for the decision to impose the maximum amount of the FBAR penalties under the mitigation guidelines, and the IRS did not abuse its discretion in determining the amount of the penalty.

**IV.     This Court Should Not Follow the Decision of the Western District of Texas in**
        ***United States v. Colliot* Regarding the Maximum FBAR Penalty.**

In 1986, Congress established the willful FBAR penalty codified at 31 U.S.C.

§ 5321(a)(5).  § 1357(c) of the Money Laundering Control Act of 1986, Pub. L. No. 99-570, Tit.

I, Subtit. H, 100 Stat. 3207, 3207-18 *et seq.* (1986).  From 1986 through 2004, § 5321(a)(5)

provided a maximum penalty for a willful failure to file an FBAR of $25,000 or "an amount (not

to exceed $100,000) equal to the balance in the account at the time of the violation," whichever

was greater.  Tracking the maximum penalty rules in the statute, the regulations, during that

period, also provided for a willful FBAR penalty "not to exceed the greater of the amount (not to

exceed $100,000) equal to the balance in the account at the time of the violation, or $25,000." 31

C.F.R. § 103.47(g)(2) (1987-1999); 31 C.F.R. § 103.57(g)(2) (1999-2004).[12]

In 2004, Congress discarded this statutory penalty maximum, implementing the much

higher maximum penalties that are now in effect.  Congress had increased the maximum

penalties to encourage recalcitrant individuals to report their foreign financial accounts to the

Treasury Department, which Congress believed was vitally important to sound tax

administration.  Upon enactment of the new penalty framework, the old regulations were

superseded by statute.  Although the Treasury Department did not withdraw the FBAR

regulations, it was unnecessary for Treasury to do so, as the outdated regulations were rendered

obsolete by the statutory change.

---

[12] For example, under the statute and regulation: (1) the maximum willful FBAR penalty for an
individual with a foreign account balance of $15,000 would be $25,000; (2) the maximum willful
FBAR penalty for an individual with a foreign account balance of $50,000 would be $50,000;
and (3) the maximum willful FBAR penalty for an individual with a foreign account balance of
$150,000 would be $100,000.

In spite of this statutory and regulatory history, in *United States v. Colliot*, No. 16-1281, 2018 WL 2271381 (W.D. Tex. May 16, 2018), a case recently decided by the United States District Court for the Western District of Texas, the court reached a different conclusion. *Colliot*, however, was based on an outdated Title 31 regulation, originally written in 1986, that was *not* intended, as the district court suggested, to "cabin[]" the Treasury Secretary's "discretion by capping penalties at $100,000."[13]  *See Colliot* at 4.  As discussed below, the regulation merely tracked the then-existing maximum penalties in the statute, and it was superseded when, in 2004, Congress discarded the statutory penalties on which the outdated regulation was based, implementing the much higher maximum penalties that are now in effect.

A.     **In the 2004 Jobs Act, Congress increased the maximum penalties for willful FBAR violations in order to improve the reporting of foreign financial accounts.**

In the American Jobs Creation Act of 2004, Pub. L. No. 108-357, 118 Stat. 1418, § 821, Congress substantially increased the penalties for individuals failing to file FBARs and also added "an additional civil penalty for a non-willful act [of] up to $10,000".  H.R. Rep. No. 108-755 at 615 (2004) (Conf. Rep.).  For willful violations after October 22, 2004, the Jobs Act increased the maximum penalty to the greater of $100,000 or fifty percent of the account balance.[14]  *See* 31 U.S.C. § 5321(a)(5)(C).  The amendment both: (1) discarded the $100,000

---

[13] On July 15, 2016, when the IRS assessed the FBAR penalty against Mrs. Kimble (Stip. ¶ 69), the regulation in question was 31 C.F.R. § 1010.820(g)(2).  The same regulation was previously numbered 31 C.F.R. § 103.47(g)(2) between 1987 and 1999 and 31 C.F.R. § 103.57(g)(2) between 1999 and 2010.

[14] For example, under the amended statute: (1) the maximum willful FBAR penalty for an individual with a foreign account balance of $50,000 would be $100,000; (2) the maximum willful FBAR penalty for an individual with a foreign account balance of $150,000 would be $100,000; and (3) the maximum willful FBAR penalty for an individual with a foreign account balance of $250,000 would be $125,000.

upper limit in the earlier statute, and (2) used half of the account balance (rather than the entire

balance) as a factor in determining the maximum penalty.  H.R. Rep. No. 108-755, at 615.  The

intent of Congress was clear.  In choosing the Senate Amendment (which "increase[d] the

pr[ior]-law penalty for willful behavior") over the original House Bill (which did not), the

Conference Committee made a specific decision to discard the maximum penalties in the prior

statute and outdated regulation.  *See id.*  "The Congress believed that increasing the prior-law

penalty for willful non-compliance with [the FBAR] requirement" would "improve the reporting

of foreign financial accounts."  Joint Comm. on Tax'n, General Explanation of Tax Legislation

Enacted in the 108th Congress, at 387 (2005).

Here, because Mrs. Kimble's willful violation occurred in 2008 (for the 2007 reporting

year)—well after Congress had increased the maximum penalty—the IRS assessed the penalty

under the new statute, rather than under the outdated regulation issued under the prior statute.  As

the IRS explained in the Internal Revenue Manual, although "the regulations at 31 C.F.R.

§ 103.57 "ha[d] not been revised to reflect the change in the willfulness penalty ceiling," the new

"statute is self-executing and the new penalty ceilings apply."  I.R.M. § 4.26.16.4.5.1 (07-01-

2008), *available at* 2008 WL 5900930.

**B.**     **The 2004 amendment to the statute superseded the outdated regulation.**

The IRS was required to assess the FBAR penalty against Mrs. Kimble in accordance

with the amended statute, not the superseded regulations.  A "regulation is valid only if it is

consistent with the statute under which it is promulgated,"  *Sealey v. United States*, 71 Fed. Cl.

278, 282 (2006) (citing *United States v. Larionoff*, 431 U.S. 864, 873 (1977)), and a regulation

"cannot override a clearly stated statutory requirement."  *Aerolineas Argentinas v. United States*,

77 F.3d 1564, 1575 (Fed. Cir. 1996).  As the Federal Circuit explained, "[w]hen a statute has

been repealed, the regulations based on that statute automatically lose their vitality.  Regulations

do not maintain an independent life, defeating the statutory change." *Id.* at 1576.  Moreover,

courts have declined to enforce outdated regulations that are inconsistent with a newly enacted

statute. *See, e.g.*, *Scofield v. Lewis*, 251 F.2d 128, 132 (5th Cir. 1958) (invalidating regulations

that were inconsistent with "the intent of Congress" in amending a section of the Internal

Revenue Code); *Farrell v. United States*, 313 F.3d 1214, 1219 (9th Cir. 2002) (holding a

Treasury regulation obsolete where it was "contradicted by [a later] version" of the Internal

Revenue Code, even though the regulation had "remain[ed] on the books").  As amended in

2004, § 5321 clearly authorized the Treasury Secretary to assess higher FBAR penalties than

those provided both in the prior statute and in the outdated regulation that Treasury had issued

merely to "reflect" the "civil penalties" in the prior statute.  Final Rule, 52 Fed. Reg. 11436,

11440 (Apr. 8, 1987).  Because the outdated regulation simply mirrored the statutory penalty

scheme that Congress discarded in 2004, Congress necessarily was rejecting the regulation as

well.

Where, as here, an older regulation is inconsistent with a newly enacted statute, the new

statute supersedes the regulation.  Accordingly, Treasury was required to comply with the

amended statute, not the outdated regulation, in calculating the FBAR penalty assessed against

Mrs. Kimble.  Therefore, the amount of the penalty imposed here was proper.

## CONCLUSION

For the reasons set forth herein, plaintiff is not entitled to a refund of the FBAR penalties.

Accordingly, the United States respectfully requests that the Court grant its motion for summary

judgment, and enter judgment in favor of the United States and against the plaintiff.

Respectfully submitted,

<u>    6/27/2018    </u>                           <u> /s/ Jason S. Selmont               </u>
Date                                             JASON S. SELMONT
                                                 Attorney of Record
                                                 U.S. Department of Justice
                                                 Tax Division
                                                 Court of Federal Claims Section
                                                 Ben Franklin Station, PO Box 26
                                                 Washington, D.C. 20044
                                                 Tel:  (202) 616-3338
                                                 Fax:  (202) 514-9440
                                                 jason.s.selmont@usdoj.gov

                                                 RICHARD E. ZUCKERMAN
                                                 Principal Deputy Assistant Attorney General
                                                 DAVID I. PINCUS
                                                 Chief, Court of Federal Claims Section
                                                 ELIZABETH A. KANYER
                                                 Trial Attorney

                                                 <u> /s/ David I. Pincus                </u>
                                                 Of Counsel